**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| OYSTER OPTICS, LLC, *Plaintiff,* v. | |
| CORIANT AMERICA INC. ET AL., | 2:16-cv-01302-JRG-RSP LEAD CASE |
| INFINERA CORPORATION, | 2:16-cv-01295-JRG-RSP |
| ALCATEL-LUCENT USA, INC., | 2:16-cv-01297-JRG-RSP |
| FUJITSU NETWORK COMMUNICATIONS, INC., | 2:16-cv-01299-JRG-RSP |
| CISCO SYSTEMS, INC. ET AL., | 2:16-cv-01301-JRG-RSP |
| HUAWEI TECHNOLOGIES CO., LTD. ET AL., | 2:16-cv-01303-JRG-RSP |
| *Defendants* | |

**PLAINTIFF OYSTER OPTICS, LLC'S MOTIONS *IN LIMINE* RE ALCATEL-LUCENT**

**REDACTED VERSION**

**TABLE OF CONTENTS**

Page(s)

MIL NO. 1: TO PRECLUDE INVALIDITY THEORIES NEVER DISCLOSED IN INITIAL OR AMENDED INVALIDITY CONTENTIONS ............................................................. 1

MIL NO. 2: TO PRECLUDE INVALIDITY TESTIMONY BASED ON "BACKGROUND REFERENCES" IDENTIFIED DURING FACT DISCOVERY ........................................... 2

MIL NO. 3: PRECLUDE UNTIMELY, ELEVENTH-HOUR DISCLOSURE OF LONG-HELD PIRELLI PRIOR-ART WITNESSES, DOCUMENTS, AND PRODUCT SAMPLES ........ 3

MIL NO. 4: PRECLUDE UNTIMELY, ADDITIONAL INVALIDITY OPINIONS BY NON-INFRINGEMENT EXPERTS ................................................................................ 6

MIL NO. 5: TO PRECLUDE OPINIONS OR ARGUMENTS CONTRADICTING THIS COURT'S *MARKMAN* ORDER .................................................................................. 8

MIL NO. 6: TO EXCLUDE EVIDENCE OF NO-LONGER-ASSERTED PATENTS AND CLAIMS, PRODUCTS, AND/OR NON-ASSERTED INFRINGEMENT THEORIES .... 10

MIL NO. 7: TO PRECLUDE ANY REFERENCE TO OYSTER BEING LITIGIOUS OR ITS BUSINESS MODEL BEING FOCUSED ON FILING LAWSUITS ................................. 11

MIL NO. 8: TO PRECLUDE ARGUMENT OR EVIDENCE ABOUT A PARTY WITNESS'S INVOLVEMENT IN OTHER, UNRELATED CASES ...................................................... 11

MIL NO. 9: TO EXCLUDE HEARSAY OPINION OF THIRD-PARTY "EXPERT" ............... 12

MIL NO. 10: TO PRECLUDE REFERENCE TO DELAYED PAYMENT OF PATENT MAINTENANCE OR CORPORATE FEES .................................................................... 13

MIL NO. 11: TO PRECLUDE LATE-PRODUCED LICENSE AGREEMENT ........................ 14

# TABLE OF AUTHORITIES

**Cases**

*Abstrax, Inc. v. Dell, Inc.*,
   No. 2:07-cv-221-DF (E.D. Tex. Oct. 7, 2009) ................................................................... 13

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 2014 WL 660857, at *3 (N.D. Cal. Feb. 20, 2014) ...................................................... 10

*Cordis Corp. v. Medtronic AVE, Inc.*,
   511 F.3d 1157, 1183-84 (Fed. Cir. 2008) ........................................................................... 10

*Cummins-Allison Corp. v. SBM Co. Ltd.*,
   2009 WL 763926 at * 4 (E.D. Tex. March 19, 2009) ........................................................... 2

*DNT, LLC v. Sprint Spectrum, LP*,
   2010 WL 582164, at *4 (E.D. Va. Feb. 12, 2010) .............................................................. 10

*Erfindergemeinschaft UroPep GbR v. Eli Lilly and Co.*,
   2017 WL 1393525, at *2 (E.D. Tex. Apr. 13, 2017) ............................................................. 3

*Finjan, Inc. Proofpoint, Inc.*,
   2015 WL 9900617, at *3 (N.D. Cal. Oct. 26, 2015) ............................................................. 6

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ........................................................................ 13

*Metaswitch Networks, Ltd. v. Genband US, LLC*,
   2016 WL 3618831 at *4 (E.D. Tex. Mar. 1, 2016) ............................................................... 3

*Mobile Telecommunications Techs., LLC v. ZTE (USA) Inc.*,
   No. 2:13-CV-946-JRG, 2016 WL 8260584, at *2 (E.D. Tex. July 22, 2016) .................... 11

*Nobelbiz, Inc. v. Glob. Connect, LLC*,
   No. 6:12-CV-244-RWS, 2015 WL 11072170, at *3 (E.D. Tex. Sept. 2, 2015) ................... 3

*PACT XXP Technologies, AG v. Xilinx, Inc.*,
   2012 WL 2774971, at *2 (E.D. Tex. May 13, 2012) .......................................................... 10

*Realtime Data LLC v. NetApp, Inc.*,
   No. 6:16-CV-961-RWS, D.I. 265 at 1, D.I. 301 at 3 (E.D. Tex. Dec. 20, 2017) .................. 6

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
   2015 WL 6247430, at *1 (E.D. Tex. Jan. 31, 2015) ........................................................... 10

*Smartflash LLC v. Apple Inc.*,
　　2015 WL 11089593, at *1 (E.D. Tex. Jan. 29, 2015) ................................................................3

**MIL NO. 1: TO PRECLUDE INVALIDITY THEORIES NEVER DISCLOSED IN INITIAL OR AMENDED INVALIDITY CONTENTIONS**

On June 23, 2017 – the deadline to disclose invalidity contentions - Cisco provided a '327 patent claim chart for the Pirelli System ("WaveMux System"). Ex. 1. In its invalidity contentions of the same date, Alcatel-Lucent ("ALU") incorporated all of the other defendants' invalidity contentions into its own. Ex. 2 at 6-7, 22, 24. Then, on January 24, 2018, a month after the fact discovery cutoff, Defendants served amended P.R. 3-3 invalidity contentions. Those contentions contain a '327 patent claim chart for the "Pirelli System" combined with the "Hooijmans" textbook. Ex. 3. In both the WaveMux chart and Pirelli/Hooijmans chart, Defendants rely on *two different* Pirelli cards, the Wavelength Converter Module (WCM) and the Receive Transponder module (RXT), to provide an *obviousness* invalidity theory. Specifically, for the "transmitter" limitations of the '327 claims, the charts refer only to the WCM cards—and not the RXT cards. *E.g.*, *id.*, limitation [1a]. And for the "receiver" and "energy level detector" limitations, the charts refer only to the RXT cards—and not the WCM cards. *E.g.*, *id.*, limitations [1d] and [1e]. Consistent with this disclosure, in his expert report Defendants' invalidity expert, Dr. Papen, expressly framed the Pirelli references as part of Defendants' *obviousness* analysis. (*E.g.*, Ex. 4, Papen Rpt., at TOC, p. 194 ("Claim 1 of the '327 Patent Is **Obvious** over the Pirelli System") (emphasis added).)

But over a month later, at the very end of Dr. Papen's deposition, Dr. Papen give a different theory. ***In redirect examination by Defendants' own counsel***, Dr. Papen explained for the first time that the "*obviousness*" heading in his report was an error and that it was actually his opinion that the Pirelli RXT card ***by itself*** satisfies each limitation of several '327 patent claims and thus ***anticipates*** those claims. Ex. 5, Papen Tr. at 144:22-147:10.

Because Defendants did not contend that the RXT card alone satisfied the "transmitter" limitations of the '327 patent in their original *or* amended invalidity contentions, neither they nor Dr. Papen should be permitted to argue that the RXT card alone satisfies '327 claim elements [1a], [14], [25a], or [36a], or that any Pirelli System card anticipates any claim of the '327 patent.

1

*Cummins-Allison Corp. v. SBM Co. Ltd.*, 2009 WL 763926 at * 4 (E.D. Tex. March 19, 2009) ("Defendants are required to submit Invalidity Charts to provide notice of how each claim element is met. Failure to provide the specific reference that allegedly reads on a claim limitation of the [asserted] Patent does not place Plaintiff on sufficient notice.").

Moreover, the prejudice to Oyster is severe and not curable. The new theory is one that suddenly transforms a long-held ***obviousness*** contention to an ***anticipation*** contention, which has different legal requirements and challenges, without ever providing a claim chart that discloses how the reference allegedly satisfies every claim element. But claim construction, fact discovery and expert discovery came and went before Defendants ever mentioned this new theory. Oyster asks that Defendants be held to their ample number of invalidity combinations that were disclosed and charts in their initial or amended invalidity contentions—but no more.

## MIL NO. 2: TO PRECLUDE INVALIDITY TESTIMONY BASED ON "BACKGROUND REFERENCES" IDENTIFIED DURING FACT DISCOVERY

In their initial and amended Invalidity Contentions, Defendants disclosed 187 prior-art references and well over 300 obviousness combinations. Exs. 2-3. Oyster relied on this notice to decide which claim-construction disputes to put before this Court, which claims to elect, and how to conduct its party and non-party deposition strategy.

Several weeks after the close of fact discovery, Defendants' invalidity expert Dr. Papen cited 26 never-before-disclosed textbooks, papers, and patents. Ex. 4, Papen Rpt. at ¶¶ 6, 17-31. Each Defendant lists some or all of these in its exhibit list. ***Only three*** of these 26 documents were produced, even in part, during the fact discovery period (Agrawal1997, Betti1995, and Senior1992 were each produced in part). The remaining 23 documents were either (i) first produced more than a month after the close of fact discovery, or (ii) not produced at all. Moreover, ***no*** P.R. 3-3(c) chart was ever provided for any of these documents. ***And none*** of these 26 documents was included in either of the two rounds of prior art elections mandated by the Court. (Dkt. 174.)

Having made no production, election or even stated theory of relevance of these documents, Defendants and their experts should not be permitted to contend that any of these

2

documents discloses elements of the asserted claims, to use these documents to support Defendants' obviousness theories, or to use these documents for any other purpose. *See Nobelbiz, Inc. v. Glob. Connect, LLC*, No. 6:12-CV-244-RWS, 2015 WL 11072170, at *3 (E.D. Tex. Sept. 2, 2015) (precluding "[d]efendants from presenting any evidence or argument regarding any alleged prior art not identified in their final election of prior art").[1]

One example from Dr. Papen's report proves this point. Defendants have long disclosed and charted numerous obviousness combinations to satisfy the claim elements of the '327 patent, and specifically relied on about 5 references they contend disclose the "phase modulate" element. *See, e.g.,* Ex. 6 at 42-43. Then, in one sentence of his 245-page expert report, Dr. Papen vaguely cites the entirety of Section IV of his report, which includes 26 new references, as a ***different, never-before-disclosed*** reason why "phase modulate" was known by those of skill in the art. Ex. 4 at ¶ 478. That Dr. Papen applies the conclusory label "clearly within the art" to these never-before-disclosed references cannot provide an end-run around this Court's rules of disclosure. To hold otherwise would enable Defendants here to disclose only certain references under the Local Patent Rules, and then in post-discovery reports disclose dozens of new (still-not-produced) references that Defendants' expert expressly plans to use to tell the jury claim elements were "within the art," moments before getting into his disclosed invalidity theories. Defendants should not be permitted to employ this litigation-by-ambush tactic.

## MIL NO. 3: PRECLUDE UNTIMELY, ELEVENTH-HOUR DISCLOSURE OF LONG-HELD PIRELLI PRIOR-ART WITNESSES, DOCUMENTS, AND PRODUCT SAMPLES

As discussed above, in its invalidity contentions, ALU incorporated all of the other defendants' invalidity contentions into its own (Ex. 2), and ALU now seeks to rely on all

---

[1] *See also Erfindergemeinschaft UroPep GbR v. Eli Lilly and Co.*, 2017 WL 1393525, at *2 (E.D. Tex. Apr. 13, 2017) (permitting the use of the [uncharted] reference for any purpose would create the risk that the jury would use that reference for the improper purpose of finding that the [uncharted] reference was itself an anticipating reference); *Smartflash LLC v. Apple Inc.*, 2015 WL 11089593, at *1 (E.D. Tex. Jan. 29, 2015) (precluding "[a]ny use, for any purpose, of any prior art references not among Defendants' final elected references"); *Metaswitch Networks, Ltd. v. Genband US, LLC*, 2016 WL 3618831 at *4 (E.D. Tex. Mar. 1, 2016) (precluding "any argument, testimony, evidence, or reference to prior art or prior art combinations that were not included in invalidity contentions or elected").

3

documents, testimony and samples produced by Cisco regarding the Pirelli system. But neither ALU nor Cisco were diligent in identifying and producing all the materials regarding this system on which they now seek to rely. Cisco provided a claim chart for the Pirelli System in their June 23, 2017 invalidity contentions, and with those contentions produced a number of documents that relate to the Pirelli System. On December 1, 2017, six months after Defendants first cited this Pirelli prior art, long after Cisco's Rule 30(b)(6) corporate representatives were deposed, and even after this Court's *Markman* hearing, Cisco amended its initial disclosures. This amendment, made a few weeks before the discovery cutoff, added for the first time two Cisco employees - Gian Luca Bonato and Maurizio Gazzola. Ex. 7 at 11. Of the two, Mr. Bonato was the only one listed as knowledgeable of the Pirelli System. *Id.* A few days later Cisco disclosed for the first time that it had an additional 1258 pages of documents related to the Pirelli system, and an example of the Pirelli RXT card. Ex. 8. On January 10, 2018, after the close of fact discovery, Defendants served the expert report of Dr. Papen, disclosing for the first time that Mr. Bonato **and** Mr. Gazzola **both** had knowledge concerning the Pirelli System. *E.g.*, Ex. 4, Papen Rpt. at ¶ 424.

All of this information has long been in Cisco's control. Cisco acquired Pirelli eighteen years ago and thereafter sold Pirelli System products under the Cisco brand. *Id.* at ¶ 422, n.21. Mr. Bonato and Mr. Gazzola are current Cisco employees, and appear to have worked for Cisco since Cisco acquired Pirelli in 2000. Cisco conceded that the 1258 pages of documents it produced in December were found on a Cisco server. Ex. 9. Cisco's counsel has suggested that Cisco stumbled across Mr. Bonato's knowledge of the Pirelli products during an unrelated interview in late November, and that the discovery of the additional documents and the purchase of the sample RXT card all flowed from this chance discovery. *Id.*

Setting aside Cisco's allegedly serendipitous employee interview over a year after this case was filed, Cisco and the other Defendants were obligated to produce the prior art documents and things they wished to rely upon as part of their P.R. 3-4(b) disclosures on June 23, 2017. Cisco was not diligent in identifying and disclosing the witnesses, documents, and RXT card that it disclosed during the final weeks of discovery (or in the case of Mr. Gazzola's knowledge of the

4

Pirelli system, weeks after the close of fact discovery). It owns the former Pirelli business and had access at all relevant times to the witnesses and documents in question. For nearly six months, it never bothered to look for them. Nor did any of the other Defendants show any diligence in searching for the documents or witnesses; they appear to have passively relied on Cisco, but the duty to comply with Court deadlines is their own.

The prejudice to Oyster from allowing Defendants to utilize these late-disclosed materials would be significant. During the time that passed between Defendants' invalidity contentions and Cisco's December disclosures, the parties briefed claim construction, and the Court held its *Markman* hearing. D.I. 182. On October 24, 2017, Oyster had to make its initial election of 48 claims to assert against each Defendant. D.I. 174. On December 8, 2017 — too soon after the December 1 identification of Mr. Bonato to depose a witness located in Italy and too soon after Cisco's belated 1258-page production to fully digest the significance of these new documents or to inspect the RXT card — Oyster had to narrow these elections to 16 claims. *Id.* The Pirelli System is only cited by the Defendants as prior art for two out of the five patents that Oyster finally elected. Ex. 4 at TOC. And in any event, knowledge of the fact that Defendants may bring witnesses and product samples relating to the Pirelli System prior art would have affected the claim elections that Oyster made, as well as the strategy that Oyster pursued throughout claim construction and discovery. For example, Oyster could have pursued a claim construction dispute for the term "transceiver card," which is one of the hotly contested claim elements Defendants now contend is disclosed by Pirelli.

On the other hand, the importance of these untimely disclosed witnesses, documents, and physical product is limited. Even without these materials, Defendants will be able to utilize otherwise admissible Pirelli-related documents produced in June 2017 and to pursue the invalidity theories that they disclosed at that time. And Defendants' expert has opined on seven other obviousness combinations for the '327 patent that do not involve the Pirelli System, along with two other obviousness combinations for the '511 patent. Ex. 4 at TOC.

In light of Defendants' lack of diligence, and the resulting prejudice to Oyster, the Pirelli-related witnesses, documents, and product sample disclosed in December 2017 (or later) should be excluded from evidence, and Defendants' expert should be precluded from citing them or relying upon them. Courts routinely exclude such evidence, even under circumstances where delayed production is far more justified, such as where prior art was not within the control of a Defendant. *See*, *e.g.*, *Finjan, Inc. Proofpoint, Inc.*, 2015 WL 9900617, at *3 (N.D. Cal. Oct. 26, 2015).[2] Here, Cisco and other Defendants *knew* about the Pirelli reference and all the while *had in their possession* the undisclosed witnesses and information. They should not be able to sit on that for six months—as claim construction proceedings, claim elections and party depositions come and go—and then produce it on the eve of discovery cutoff and still rely on it at trial.

## MIL NO. 4: PRECLUDE UNTIMELY, ADDITIONAL INVALIDITY OPINIONS BY NON-INFRINGEMENT EXPERTS

This Court's DCO required each party to serve Rule 26 expert reports for "Expert Witnesses by the Party with the Burden of Proof" on or before January 10, 2018. Because Defendants bear the burden of proof on invalidity, they were required to serve all expert opinions pertaining to invalidity issues by this date—and purported to do so by serving a written report by Dr. Papen, their only disclosed expert on invalidity. But three weeks later, on January 31, 2018, some Defendants served non-infringement rebuttal reports that were filled with *different, additional* opinions about which elements were supposedly known at the time of the invention.

One example serves to illustrate the potential issue. Cisco's expert, Dr. Brown, who was never disclosed as providing any expert opinions on invalidity, weaves into his January 31, 2018 "non-infringement" rebuttal report extensive opinions on what elements were known in the art, including whether "phase modulation" was known. Though this issue is hotly contested by the competing experts who actually provided reports on validity, Dr. Brown intends to disclose – for

---

[2] *See also,* D.I. 222 (denying leave to amend infringement contentions, citing need for defendant to "revamp" its litigation strategy and likelihood of additional claim-construction disputes); Ex. 20, *Realtime Data LLC v. NetApp, Inc.*, No. 6:16-CV-961-RWS, D.I. 265 at 1, D.I. 301 at 3 (E.D. Tex. Dec. 20, 2017) (precluding from trial third-party prior-art witness identified before the close of fact discovery due to lack of diligence in obtaining information).

6

the first time – a new and additional invalidity theory that relies upon undisclosed prior art (a "1987 chapter" in a book on optics) to tell the jury that phase modulation was known. *See* Ex. 10, Brown Tr. at 265: 7-11 ("And so, for example, I have a 1987 chapter on coherent optical communication that identifies different types of phase modulators and a way of making a phase modulator."). Indeed, after accounting for the dozens of sentences and interwoven sections in his 250-page report discussing prior art, he appears to opine that virtually ***every claim element*** of the '327 patent was "known" or already "conventional" in the art. *See, e.g.*, Ex. 11, Brown Rpt. at ¶ 162 ("the [telecommunications] box itself was prior art"); *id*. at ¶ 585 (the asserted patents "do not disclose new encoding, modulation or demodulation technology"); *id*. at ¶¶ 174-176 ("optical receiver was already known in the prior art" and "it was known in the art … to utilize a photodiode to direct detect [] modulated signals.").

After opining that every element is in the "prior art" in ways never disclosed in Defendants' Invalidity Contentions or Dr. Papen's report, Dr. Brown then goes one step further, opining that the only remaining "***patented improvement***" is not in any claim element at all, but rather can only be the "***security improvement of optical tap detection***." *Id.* at ¶ 585 (emphasis added). To make matters worse, Dr. Brown ***never references*** Dr. Papen's report *or* the Defendants' disclosed or elected prior art. Cisco's insertion of this testimony thus seeks to evade all the Court's disclosure requirements under Patent Local Rule 3.3 and Defendants' Election of Prior Art, and just tell the jury that every element was known in the art according to the level of knowledge of one of skill in the art. If there were any doubt about Cisco's intentions at trial, Dr. Brown confirmed that he fully intends to provide prior-art opinions to the jury during his "non-infringement" testimony:

> Q. Do you intend to provide any testimony at trial on what elements where known at the time of. . .
> A. I – as part of my report, as set forth in my report, there's a lot of discussion of prior art. And so the information about prior art that is in my report, I would – might expect to talk about also in the event of a trial.

Ex. 10 at 264:6-10; *see also id*. at 261-65.

One of the main reasons the Local Patent Rules exist is to specifically prevent this sort of

7

testimony on "the amorphous knowledge of one of skill in the art." *Finisar Cor. v. DirecTV Group, Inc.*, 424 F. Supp. 2d 896, 898 (E.D. Tex. 2006). Moreover, Defendants' trial-by-ambush tactic is in clear violation of this Court's Docket Control Order and should be excluded for that reason alone. It also violates this Court's invalidity-disclosure requirements, and is extremely prejudicial to Oyster. For instance, Oyster provided its rebuttal opinions on invalidity on January 31 and, thus, had no opportunity to rebut a different set of opinions about "the prior art."

During a recent meet and confer on this issue, Defendants tried to justify this clear violation by suggesting that opinions like those of Dr. Brown relate to "damages issues." That fails for several reasons. ***First***, framing invalidity opinions as "noninfringement" or "damages" testimony does not alter the fact that they are invalidity opinions. Dr. Brown proved this point during his deposition. Even for the sections of his report that supposedly provide a damages opinion defining the "patented improvement," Dr. Brown described the process of deriving that opinion as ***"going claim element by claim element*** and making an assessment ***based on my knowledge of what a person in the art would know*** at the time of patent was written and what would have been well understood." Ex. 10 at 261:17-23 (emphasis added). ***Second***, even if there is some purported overlap with damages issues, it cannot circumvent this Court's disclosure rules. If Defendants believe that some technical opinions pertaining to "conventional" elements" or "known elements" in the prior art were necessary for their damages opinions, they should have disclosed them on January 10.

## MIL NO. 5: TO PRECLUDE OPINIONS OR ARGUMENTS CONTRADICTING THIS COURT'S *MARKMAN* ORDER

During *Markman* proceedings before this Court, Defendants argued that "energy level detector" was limited to a "device for optical tap detection." D.I. 165 at 6-8. In support of this argument, citing to the "Summary of the Invention," Defendants contended that "[t]he intrinsic evidence confirms that the 'energy level detector' is a device for ***optical-tap*** detection, which is a central piece of the invention's solution for securing optical-fiber communications." *Id.* at 6. Defendants further argued (in the context of the no-longer-asserted '012 patent) that "tap"

8

detection was limited to the detection of a ***surreptitious*** breach. *Id.* at 17.

This Court's December 5, 2017 claim construction order correctly rejected all of these arguments. For example, the Court addressed and "expressly reject[ed]" Defendants' argument that the claims are limited to a surreptitious "tap" or that the claimed energy level detector is limited to "a tap detection" mechanism at all. D.I. 190 at 25. Instead, this Court correctly held that the patent teachings are not so limited and that the claim elements, when properly construed, are not so limited, either. *Id.*

There is strong reason to believe that Defendants intend to present expert testimony that reads as if the Order never issued. The opinion of Cisco's expert Dr. Brown is again illustrative of this problem, as he does this in at least two ways, neither of which are proper. ***First***, right before and mixed into his non-infringement opinions, Dr. Brown provides the explanation of the patents that he intends to provide to the jury. Incredibly, that explanation relies on the ***same*** disclosures this Court deemed to ***not limit*** the scope of the invention to limit the invention. Specifically, Dr. Brown limits the sole "problem" tackled by the invention to a "security" challenge, and also suggests the claimed solution focuses solely upon tap detection and related, unclaimed elements. *E.g.*, Ex. 11, Brown Rpt., at ¶¶ 138-151, 515. *See also id.* at ¶ 183 ("the energy level detector … detect[s] optical taps such as might indicate the presence of an insecure line."). This discussion of optical taps occupies nearly ***forty pages*** of Dr. Brown's report. *See, e.g., id.* at 56-66, 188-197, 200-09, 216-18. ***Second***, using a phrase that can only be seen as a shorthand for claim elements, Dr. Brown contends that the only possible "patented improvement" is "the purported security improvement of optical tap detection." *Id.* at ¶ 585. And this discussion of "tap detection" and the singular "security" focus goes on for ***ten full pages***. *Id.* at 56-66. Indeed, in deposition, Dr. Brown admitted under oath that he "*focused*" his opinions on the tap's "potential usefulness for security in an optical network." Ex. 10 at 262:8-9.

These are collateral attacks on this Court's *Markman* Order. Dr. Brown's opinions expressly contradict this Court's claim construction, which already expressly rejected Defendants' attempt to limit the patent claims to "tap detection." D.I. 190 at 25. At the very least, weaving in

9

page after page of "tap detection" as the sole "patented improvement" or claimed "solution" effectively enables Cisco to re-argue the same rejected positions to the jury, creating an end-run around the entire construction process and this Court's express rulings.[3]

A party should not be allowed to urge a narrow construction for a claim element, (rightly) lose that claim-construction dispute, but then merely repackage those same arguments as an "explanation of the patents" that its expert intends to provide immediately before and during his non-infringement testimony. Nor should that party be able to repackage rejected claim constructions as supposed opinions on the sole "patented improvement."

## MIL NO. 6: TO EXCLUDE EVIDENCE OF NO-LONGER-ASSERTED PATENTS AND CLAIMS, PRODUCTS, AND/OR NON-ASSERTED INFRINGEMENT THEORIES

In this case, Oyster agreed to streamline proceedings and reduce costs by twice electing a subset of patents and claims from the ones it had asserted in its Complaints. In certain instances, this election also resulted in dropped products. Defendants should not be able to benefit from this now-common practice and then turn around and still hold on to the prior assertions and tell the jury about them, in any fashion. Instead, they should be precluded from introducing any evidence or argument concerning patents or claims that were previously asserted but are no longer at issue, products of Defendants that are no longer accused, and/or non-asserted theories of infringement. Such evidence and argument is properly excluded under Federal Rule of Evidence 403 because of the high risk of jury confusion. *See, e.g., Cordis Corp. v. Medtronic AVE, Inc.*, 511 F.3d 1157, 1183-84 (Fed. Cir. 2008) (affirming exclusion of evidence of unasserted patents and claims under FRE 403). This Court regularly excludes such evidence at the time of trial.[4]

---

[3] *DNT, LLC v. Sprint Spectrum, LP*, 2010 WL 582164, at *4 (E.D. Va. Feb. 12, 2010) (granting motion *in limine*, holding that "[o]nce the Court has construed the terms as required by the *Markman* hearing, the parties are bound by said construction."); *Apple, Inc. v. Samsung Elecs. Co.*, No. 2014 WL 660857, at *3 (N.D. Cal. Feb. 20, 2014) ("Arguing claim construction to the jury is inappropriate because it risks confusion and the likelihood that a jury will render a verdict not supported by substantial evidence.")

[4] *See, e.g., PACT XXP Technologies, AG v. Xilinx, Inc.*, 2012 WL 2774971, at *2 (E.D. Tex. May 13, 2012) ("It is not clear why the Court should permit any party to introduce patents that are not asserted in this case."); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 2015 WL 6247430, at *1 (E.D. Tex. Jan. 31, 2015) (granting Plaintiff's motion *in limine* to exclude evidence of "litigation brought by [Plaintiff] unrelated to the patents-in-suit").

Recognizing this case law, Defendants offered not to introduce this evidence with respect to patent infringement and validity, but want to reserve the right to seek introduction of the same evidence for damages purposes. While Oyster agrees that damages experts may discuss certain dropped or unasserted patents as necessary in their analyses of comparable licenses, Defendants' position on admissibility of this wide range of evidence for damages purposes risks confusing the jury in exactly the same way as if offered for infringement or validity. Accordingly, the Court should preclude Defendants from introducing any evidence or argument concerning patents or claims which were previously asserted but are no longer at issue, products of Defendants that are no longer accused, and/or non-asserted theories of infringement.

**MIL NO. 7: TO PRECLUDE ANY REFERENCE TO OYSTER BEING LITIGIOUS OR ITS BUSINESS MODEL BEING FOCUSED ON FILING LAWSUITS**

Defendants should be precluded from making any reference to Oyster being "litigious," or to Oyster's business model being focused on litigation. Defendants have not agreed to refrain from making such references, though they have agreed to refrain from using pejorative terms such as "troll" or "pirate." Describing Oyster as litigious or describing Oyster's business model as founded on litigation necessarily involves at least alluding to unrelated litigation, which this Court has routinely excluded as improper. *See, e.g.*, *Mobile Telecommunications Techs., LLC v. ZTE (USA) Inc.*, No. 2:13-CV-946-JRG, 2016 WL 8260584, at *2 (E.D. Tex. July 22, 2016) (Gilstrap, J.) (barring references to "unrelated litigations, investigations, or accusations involving the parties"). Referring to other litigation would only confuse the jury and would not assist it in deciding *any* of the issues in this case.

**MIL NO. 8: TO PRECLUDE ARGUMENT OR EVIDENCE ABOUT A PARTY WITNESS'S INVOLVEMENT IN OTHER, UNRELATED CASES**

At the deposition of Oyster representative Jeffrey Ronaldi, counsel questioned Mr. Ronaldi at length about his history with other companies that also brought lawsuits to enforce their patents. *See* Ex. 12, Ronaldi Tr. at 30-140. During the course of this questioning, which spanned more than a hundred transcript pages, Cisco's counsel summed up the point of this exhaustive inquiry: "You guys file a lot of lawsuits." *Id.* at 114. Oyster anticipates that Defendants may try to elicit

11

similar testimony at trial about Mr. Ronaldi's involvement with other corporations and patent cases, in support of the implication that Oyster or Mr. Rolaldi are unreasonably or excessively litigious. As described in MIL 7 above, this is an improper inference. Moreover, Mr. Ronaldi's involvement in other litigation has no bearing on *this* action, and risks creating confusion.

**MIL NO. 9: TO EXCLUDE HEARSAY OPINION OF THIRD-PARTY "EXPERT"**

ALU should be precluded from introducing evidence or opinion regarding an opinion by a third-party "expert," because these are hearsay statements from an "expert" whose qualifications are unknown. In a May 24, 2004 e-mail, "Robert Brown" (not the Dr. *Thomas* Brown who is Cisco's expert) provided the opinions at issue to an investor in Oyster Optics, Inc. Peter Snawerdt, the inventor of the patents in suit, inserted the statements made in Brown's e-mail into a May 29, 2002 memo to this investor, and responded to each of the statements in turn. Ex. 13. *See also* Ex. 14, Snawerdt Tr. at 231 (identifying text in memo as statements by Brown). Defendants seek to introduce this memo, including the hearsay statement therein, into evidence. The kind of mischief that Defendants intend to make with this evidence can be seen in some of Defendants' damages experts' opinions. *See, e.g.*, Ex. 15, Fancher Rpt., ¶¶ 151-152 (ALU expert: Brown opinion is



); Ex. 16, Becker Rpt., n.213 (Cisco expert quoting Brown: "

Not only are the Brown statements clearly hearsay, they represent an expert technical analysis from an individual whose qualifications are unknown. Ex. 14, Snawerdt Tr. at 232 (does not know who Brown was, so "don't know how he could form his opinion" on the state of the art); Ex. 15, Fancher Rpt., ¶ 151 (Brown's "credentials are not provided"). It would be confusing to the jury and prejudicial to Oyster to introduce this third-party technical opinion of questionable provenance. Nor can it be established that Brown was qualified to render the opinion at issue, or that the opinion was methodologically sound. Fed. R. Evid. 702. Moreover, it is improper for

defendants' damages experts to serve as a conduit for this technical opinion, especially as they have neither the information nor the qualifications to evaluate its reliability. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007).

## **MIL NO. 10: TO PRECLUDE REFERENCE TO DELAYED PAYMENT OF PATENT MAINTENANCE OR CORPORATE FEES**

Defendants should be precluded from introducing evidence or argument concerning delays in the payment of patent maintenance fees. The evidence is not relevant to ***any*** issue in the case. Tellingly, this was not even cited or otherwise raised by any of Defendants' experts. The evidence in question concerns one unasserted patent ('816), and another patent ('952) asserted against only Huawei and Alcatel Lucent. The patent owner unintentionally failed to timely pay fees on those patents, but ultimately did pay them. All of this occurred long before the relevant damages period, so the late payments can have no effect upon the enforceability of the patents in this case. And Defendants have not even alleged otherwise.

While proving absolutely nothing, introducing this evidence to the jury presents the real danger of prejudicial confusion. For example, the jury may draw unwarranted inferences as to why the payments were late, wrongly assuming that the patent owner did not value the patents enough to maintain them. This Court has recognized this danger even in situations where - unlike here - delayed fee payments were actually relevant to issues in the case. *See* Ex. 21, *Abstrax, Inc. v. Dell, Inc.*, No. 2:07-cv-221-DF (E.D. Tex. Oct. 7, 2009), D.I. 281 at 4 ("The late-paid maintenance fee's relevance to the valuation of the patent and the benefits of the patent under *Georgia-Pacific* factors is valid, but any probative value on that issue is substantially outweighed by the dangers of undue prejudice."). And this is not the only risk. Evidence of delayed payments might also cause the jury to question – without warrant or basis – the enforceability of patents having a history of late maintenance fees. Defendants should not be allowed to prompt the jury to make this inference with this irrelevant evidence. *See* Fed. R. Evid. 402, 403.

Defendants should also be precluded from presenting evidence of the prior owner of the patent owner Oyster Inc.'s delay in paying corporate maintenance fees. Such delays have no

13

bearing on *any* issue in the case. The silence of Defendants' own experts only further confirms this irrelevance. Introducing it to the jury hazards real prejudice. The jury may view Oyster Inc. and its successors in a bad light, thinking them to be unsuccessful, unserious, or uncommitted. The record does not support any such inference, and the Defendants should not be permitted to curry it using evidence that is not at all relevant to any issue in the case.

**MIL NO. 11: TO PRECLUDE LATE-PRODUCED LICENSE AGREEMENT**

ALU should be precluded from introducing evidence of its license agreement with ▮▮▮▮▮ (the "Agreement"), and ALU's experts should be precluded from relying on this agreement, because ALU failed to produce or identify the Agreement during discovery despite an interrogatory and deposition topic calling for its identification. Oyster's Interrogatory 6 requested that ALU identify all license that "relate to the Accused Instrumentalities" or are relevant to damages. Ex. 17, ALU's 1st Suppl. Resps, at 14. Three days before the close of fact discovery, ALU responded by identifying a Bates range that did not include the Agreement, which had not been produced by ALU. *Id.* at 15. On the same day, ALU's 30(b)(6) witness on licensing topics was unable to identify any ALU licenses related to optical communications products besides those ALU had produced. Ex. 18, Olson Tr. at 69-71.

On January 9, 2017, after the close of fact discovery, ALU first produced the Agreement. An ALU witness, William Thompson, whom Oyster had previously deposed, then told ALU's damages expert that the technology licensed in the Agreement is included in the accused products in this case. Ex. 19, Fancher Tr. at 11. Thus there is no question that ALU knew the Agreement was responsive to the Interrogatory requesting identification of all licenses related to the Accused Instrumentality. Because of ALU's failure to identify or produce the Agreement, Oyster was unable to ask either ALU's licensing witness or Mr. Thompson about the Agreement during their depositions, leaving ALU's damages expert free to speculate about the facts relevant to the Agreement without fear of contradiction by actual evidence. *See, e.g.,* Ex. 19, Fancher Tr. at 39-42 (expert speculates based on his "experience" that lump sum royalty reflects the extent of ALU's

use of the licensed technology, but did not ask Mr. Thompson or anyone else at ALU how the lump sum was actually determined).

Dated: April 18, 2018

Respectfully submitted,

**OYSTER OPTICS, LLC**

By: /s/ *Reza Mirzaie*
Marc A. Fenster (CA SBN 181067)
E-mail: mfenster@raklaw.com
Reza Mirzaie (CA SBN 246953)
E-mail: rmirzaie@raklaw.com
Amir A. Naini (CA SBN 226627)
Email: anaini@raklaw.com
Neil A. Rubin (CA SBN 250761)
Email: nrubin@raklaw.com
Arka Chatterjee (CA SBN 268546)
E-mail: achatterjee@raklaw.com
Adam S. Hoffman (CA SBN 218740)
Email: ahoffman@raklaw.com
Theresa Troupson (CA SBN 301215)
Email: troupson@raklaw.com
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
Telephone: 310/826-7474
Facsimile: 310/826-6991

T. John Ward, Jr. (TX SBN 00794818)
E-mail: jw@wsfirm.com
Claire Abernathy Henry (TX SBN 24053063)
E-mail: claire@wsfirm.com
Andrea L. Fair (TX SBN 24078488)
E-mail: andrea@wsfirm.com
WARD, SMITH & HILL, PLLC
P.O. Box 13231
Longview, Texas 75601
Tele: 903/757-6400
Facsimile 903/757-2323

**Attorneys for Plaintiff
OYSTER OPTICS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record via electronic service on April 18, 2018.

/s/ *Reza Mirzaie*

**CERTIFICATE OF CONFERENCE**

I hereby certify that counsel for Oyster and counsel for Alcatel met and conferred concerning the substance of this motion and the relief requested on multiple occasions, through multiple phone calls and through multiple emails, from April 12 through 18. Following discussions, Alcatel remains opposed to this motion and the relief requested. Discussions conclusively ended in an impasse, leaving open the instant issues for the Court to resolve.

/s/ *Reza Miraie*

**CERTICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I certify that pursuant to Local Rule CV-5(a)(7)(B) that on May 18, 2017 the Court entered a Protective Order (Dkt. 95) authorizing the filing of documents designated pursuant to the Protective Order under seal.

/s/ *Reza Mirzaie*