# EXHIBIT E

REDACTED VERSION

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| OYSTER OPTICS, LLC,<br><br>*Plaintiff,*<br><br>v. | |
| CORIANT NORTH AMERICA, LLC ET AL., | 2:16-cv-01302-JRG<br>LEAD CASE |
| INFINERA CORPORATION, | 2:16-cv-01295-JRG |
| ALCATEL-LUCENT USA INC., | 2:16-cv-01297-JRG |
| FUJITSU NETWORK COMMUNICATIONS, INC., | 2:16-cv-01299-JRG |
| CISCO SYSTEMS, INC., | 2:16-cv-01301-JRG |
| HUAWEI TECHNOLOGIES CO., LTD. ET AL., | 2:16-cv-01303-JRG |
| *Defendants.* | |

**EXPERT REBUTTAL REPORT OF DR. JOHN A. BUCK
REGARDING NONINFRINGEMENT OF U.S. PATENT NOS. 6,476,952;
6,594,055; 7,099,592; 7,620,327; AND 8,374,511 BY DEFENDANT
ALCATEL-LUCENT USA INC.**

Dated: January 31, 2018

Dr. John A. Buck

practice each and every element of the claim.   In my opinion, the accused products do not infringe claim 13 of the '592 patent.

### D.    327 Patent[10]

#### a.    Claim 5

98.    Claim 5 is dependent on Claim 1. Therefore, to show infringement of Claim 5, Oyster must first show infringement of claim 1. Claims 1 and 5 recite:

*1.  [preamble]  A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:*

*[a]  a transmitter for transmitting data over the first optical fiber, the transmitter having a laser, a modulator, and a controller receiving input data and controlling the modulator as a function of the input data, the transmitter transmitting optical signals for telecommunication as a function of the input data;*

*[b]  a fiber output optically connected to the laser for connecting the first optical fiber to the card;*

*[c]  a fiber input for connecting the second optical fiber to the card;*

*[d]  a receiver[11] optically connected to the fiber input for receiving data from the second optical fiber; and*

*[e]  an energy level detector[12] optically connected between the receiver and the fiber input to measure an energy level of the optical signals,[13] wherein the energy level detector includes a plurality of thresholds.*

---

[10] Dr. Dallesasse only contends that ███████████████████ infringe the '327 patent claims.

[11] I understand from counsel for ALU that the defendants have filed a motion with the Court seeking reconsideration of the construction of "receiver" as it appears in the '327 and '511 claims. If the Court rules in Defendants' favor and finds that the term "receiver" in those two patents means "receiver without a demodulator," it is my opinion that the accused ALU products do not satisfy this limitation because ████████████████████████████████ ████████████████████████       Thompson Dep. Trans. 143:17-20.
    Throughout the claims, an "energy level detector" is a "device to measure optical power."  Ex. C.

[13] In the '327 patent claims, "the optical signals" means "the optical data signals received on the fiber input from the second optical fiber."  Ex. C.

*5. The card as recited in claim 1 wherein the energy level detector includes a photodiode and a liner or logarithmic amplifier scaling an output of the photodiode.*

### i. Dr. Dallesasse improperly relies on OIF documentation.

99.     As an initial matter, Dr. Dallesasse frequently relies on an OIF document in support of his contention that the accused ALU products infringe.  There are multiple problems with his reliance on this document as discussed above.  *See, e.g.*, Section VII.A.

100.     First, with regard to the OIF-FD-100G-DWDM-01.0 document, this document does not describe a specific standard to which a product could even be compliant. Rather, this document was drafted by several OIF members as a framework for a potential standard.  Thus, even if a standard resulted from the framework in the document, and even if ALU was compliant with such a standard, this document does not show that ALU was compliant with any such standard.

101.     Second, Dr. Dallesasse states that ALU is a member of an organization that sets standards but provides no explanation as to why or how accused ALU products are compliant.  I see no reason why membership in a standard setting organization means that a company's products necessarily comply with all or any of the potential standards that are set by that organization.

102.     Accordingly, in my opinion this document is not relevant as to whether the accused ALU products infringe the asserted claims.

ii.     ████████████████████████████████████
████████████████████████████████

103.

